Civil action for alienation of plaintiff's wife's affections, and for criminal conversation.
The plaintiff is 47 years of age; his wife 45. They were married 24 December, 1918, and have had 12 children; 11 now living, the oldest 24 and the youngest 6. In 1940 they were tenants on Dr. Lynn McIver's farm, and their second oldest son operated a filling station for the defendant across the street from defendant's market in Sanford. In *Page 743 
February, 1941, the plaintiff and his family moved to the defendant's farm, three or four miles from Sanford, and operated it as tenants during that year. The plaintiff's wife made the arrangements for the renting of the farm, as the plaintiff was then working temporarily as a carpenter at Fort Bragg.
On 1 January, 1942, the plaintiff moved to Moore County with his children, except Odell, the oldest son, and two small daughters, who, with their mother, remained on the Dowdy farm during the crop season of 1942, and until Odell was drafted into the Army. Odell rented the defendant's farm during the 1942 season; and some time during the year his 15-year-old brother, Claude, returned and stayed with their mother. The plaintiff and his wife are not now living together, and have not lived together since the plaintiff moved to Moore County.
The defendant is 48 years of age and has a large family, a wife and 9 children. He lives with his family in Sanford and runs a meat market and carries on an active slaughtering, cattle and hog business at his farm. In connection with his market he sells groceries, apples, cabbages and other produce. He also owns a blacksmith shop, and has an office on the basement floor of the Seymour Building, or Johnson Furniture Company Building, which is located on one of the principal streets in the town of Sanford.
The plaintiff's evidence tends to show that before he moved to defendant's farm, his wife seemed satisfied and their relations were entirely congenial; that immediately thereafter her attitude changed, both towards him and their children; that the defendant often came to plaintiff's home, "lots of time when he didn't have any business"; that he was around with plaintiff's wife, talking to her, and from time to time, they left the house together; that frequently they were away in defendant's automobile for several hours, without plaintiff's knowledge or consent, and that on numerous occasions the defendant brought to plaintiff's home apples and chewing gum which he gave to plaintiff's wife and children. He also gave plaintiff's wife a cow and a pig.
Plaintiff's 18-year-old daughter, Dorothy May, testified that on one occasion just before her father moved away, she saw "Dowdy kiss Mama" in the sitting room. On another occasion, in December, 1941, "he asked Mama to go to the slaughter pen with him, and they went out across the pasture and when they were out of sight I happened to glance over there and they were holding hands." (Cross-examination.) The day they walked to the slaughter pen, "they were not in the woods or anything of that sort. It is a clear open space around the house. . . . There were some eleven of us around there. . . . My father wasn't at the house; he might have been on the place. . . . The children were out *Page 744 
there playing and they went where they were and they all came back together."
Plaintiff's wife on three or four occasions went to Sanford with two or three of the children, ostensibly to attend a picture show, but instead she would place the children in the theatre and advise them to meet her after the show at the defendant's store. The children would go to the defendant's store after the show, without finding their mother, and after waiting an hour or more, "she would come up in the car with Mr. Dowdy; nobody else was with them." The defendant would then take plaintiff's wife and children within a short distance of their home, put them out and let them walk the rest of the way. Plaintiff's wife was often seen with the defendant in his office in Sanford. The plaintiff remonstrated with the defendant, and told him he would "give up the farm and leave. . . . I can't put up with the way you and my wife are going on. . . . You are sorrier than any Negro I ever had anything to do with. . . . Yes, I have seen you sell liquor. . . . I could have money too if I sold liquor. . . . If you want to carry a woman with you, carry your own wife."
After leaving the defendant's farm, the plaintiff made complaint to the sheriffs of Lee and Moore counties and to the chief of police of Sanford and asked them to help him "catch his wife. . . . Catch Mr. Dowdy and his wife," stating that the defendant had been "interfering with his family for the past six months." It is in evidence that plaintiff is a man of good character.
The defendant took the stand and also called the plaintiff's wife as a witness in his behalf. They denied the implications of plaintiff's evidence; explained that the trips taken were on business, some at the instance of the plaintiff; that the plaintiff knew of the small favors which the defendant showed the plaintiff and his family; that plaintiff's wife and children were driven near their home on several occasions and allowed to walk a short distance because of the muddy condition of the road, which fact was reported to the plaintiff by members of his family at the time. They both asserted that Dorothy May Barker was entirely mistaken in her testimony. Defendant specifically denied any suggestion of impropriety or remonstrance on the part of the plaintiff, and contends the plaintiff's testimony in this respect is wholly unreasonable. Plaintiff's wife testified that when she left the children in the picture show, she went shopping in Sanford; that at such times as she went into the defendant's store, or rode alone with him in his car, she went on business connected with the farm.
Evidence was elicited and offered to the effect that plaintiff's difficulty with his wife grew out of a quarrel between them in August, 1941, which *Page 745 
resulted in physical injury to the wife, causing her to remain in bed — plaintiff says three days, she says a week.
There is evidence of the good character of plaintiff's wife, and also of the defendant.
Motion for judgment of nonsuit renewed at the close of all the evidence. Overruled; exception.
The jury returned the following verdict:
"1. Did the defendant, E. P. Dowdy, wrongfully alienate the affections of the plaintiff's wife, as alleged in the complaint? Answer: Yes.
"2. Did the defendant, E. P. Dowdy, have immoral relations with the plaintiff's wife, as alleged in the complaint? Answer: Yes.
"3. Were the wrongful acts of defendant malicious? Answer: Yes.
"4. What amount of actual damages, if any, is the plaintiff entitled to recover of the defendant, E. P. Dowdy? Answer: $5,000.00.
"5. What amount of punitive damages, if any, is the plaintiff entitled to recover from the defendant, E. P. Dowdy? Answer: $2,500.00."
With the consent of the plaintiff, the court reduced the amount of actual damages to $4,000, and the amount of punitive damages to $1,500, and entered judgment accordingly.
Defendant appeals, assigning errors.
This is the same case that was before us on demurrer to the complaint at the Spring Term, 1943, reported in 223 N.C. 151, 25 S.E.2d 404. It is here now on demurrer to the evidence and the validity of the trial.
Defendant insists that plaintiff's own evidence shows his wife's estrangement derives from their quarrel in August, 1941; that plaintiff told the officers in January, 1942, "Dowdy had been giving him trouble with his wife" for the past six months — just the length of time following the quarrel — and that his testimony of remonstrance is too fanciful to support a verdict for alienation of affections. Rose v. Dean,192 N.C. 556, 135 S.E. 348. The evidence suffices, we think, to carry the case to the jury on the first cause of action. Johnston v. Johnston,213 N.C. 255, 195 S.E. 807; Chestnut v. Sutton, 207 N.C. 256,176 S.E. 743; Cottle v. Johnson, 179 N.C. 426, 102 S.E. 769.
We are constrained to agree with the defendant, however, that the evidence is wanting in sufficiency to support a verdict for criminal conversation. S. v. Miller, 214 N.C. 317, 199 S.E. 89; S. v. Woodell,211 N.C. 635, 191 S.E. 334; S. v. Aswell, 193 N.C. 399,137 S.E. 174. It does no more than raise a suspicion, which is explained by the *Page 746 
defendant's evidence. Pollard v. Pollard, 221 N.C. 46, 19 S.E.2d 1;Walker v. Walker, 201 N.C. 183, 159 S.E. 363; Dowdy v. Dowdy, 154 N.C. 556,70 S.E. 917. If the failure to testify under the circumstances here disclosed affords an inference against the defendant, and we have held that it does, Powell v. Strickland, 163 N.C. 393, 79 S.E. 872, Walkerv. Walker, supra, then the fact that he goes on the stand and explains the suspicious circumstances would avoid such inference or remove any unfavorable impression that might arise from the failure to testify.
This necessitates a new trial on the first cause of action, because the first and second issues were submitted jointly to the jury, and the 3rd, 4th and 5th issues would need to be reconsidered after elimination of the second issue. Hankins v. Hankins, 202 N.C. 358, 162 S.E. 766; 27 Am.Jur., 129.
On first cause of action, New trial.
On second cause of action, Reversed.